UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Kap Jeung Tang,

                    Plaintiff,                    CV-03-6477 (CPS)

    - against -                                   MEMORANDUM OPINION
                                                  AND ORDER
Jinro America, Inc., JS America, Inc.
and Gun Chul Lee,

                    Defendants.

-----------------------------------------X

SIFTON, Senior Judge.

    Plaintiff, Kap Jeung Tang ("Tang") brings this action

against defendants Jinro America, Inc. ("JAM"), JS America, Inc.

("JSA"), and Gun Chul Lee ("Lee") to recover damages arising from

the alleged wrongful termination of Plaintiff's exclusive rights

to distribute a premium brand of Korean liquor.  Plaintiff

alleges claims for: (1) breach of contract; (2) tortious

interference with contract against defendants JSA and Lee; (3)

tortious interference with prospective economic advantage; (4)

unjust enrichment; (5) unfair competition; and (6) breach of

covenant of good faith and fair dealing.  Defendants assert

counterclaims alleging (1) willful trademark infringement; (2)

unfair competition; and (3) dilution of a famous mark.

    Presently before the Court is Defendants' motion for summary

judgment dismissing Plaintiff's claims pursuant to Federal Rule

of Civil Procedure 56.  For the reasons that follow, the motion

is granted.

**BACKGROUND**

The following facts are drawn from the complaint, Local Rule 56.1 statements, affidavits, depositions, and exhibits submitted in connection with this motion. They are undisputed except where noted.

Plaintiff Kap Jeung Tang, a licensed wholesaler of alcoholic beverages, is a citizen of Pennsylvania. His company, Tang's Liquor Wholesale Co., has its principal place of business in Queens County, New York. Defendant Jinro America, Inc. ("JAM") is a corporation organized and existing under the laws of the State of Washington with its principal place of business in the State of California. Defendant JS America, Inc. ("JSA") is a New Jersey corporation with its principal place of business in the State of New Jersey. Defendant Gun Chul Lee, a citizen of New Jersey, is the President, Secretary, Treasurer, sole Director and sole stockholder of defendant JSA.

In 1992, Defendant JAM, by written agreement (the "1992 agreement"), granted Plaintiff Tang exclusive distribution rights in New York, New Jersey, Maryland, Virginia, and the District of Columbia (the "Territory") for the Jinro brand of Korean distilled spirits known as soju ("Jinro Soju").[1] Those rights were to expire after five years. JAM was at that time the sole

---

[1] Plaintiff Tang contends that he began distributing Jinro Soju in 1986 "pursuant to an agreement that was either oral or, if written, has not been located." The time period between 1986 and 1992 is not at issue.

importer of Jinro Soju and wholly owned by Jinro Ltd., the Korean
manufacturer of the product.  Upon the expiration of the 1992
agreement, the parties entered into a new distributorship
agreement on December 1, 1997 (the "1997 agreement") to expire
November 30, 1999.  Plaintiff alleges that, upon expiration of
the 1997 agreement, it was his understanding that so long as he
performed well, he would continue to be the exclusive distributor
of Jinro Soju in the Territory.[2]  Plaintiff continued to buy from
JAM (and JAM continued to supply) the Jinro products and to
distribute them within the Territory in absence of a written
agreement.  Plaintiff contends that due to his efforts, sales of
Jinro Soju in Plaintiff's exclusive territory grew from none in
1986 to over $3.75 million worth in 2001.

Plaintiff asserts that sometime in late 1999, Defendant Lee
replaced the prior president of JAM.  On August 3, 2001, JAM sent
a letter to Plaintiff noting that the 1997 agreement had expired.
The letter further stated that pursuant to its management
strategy, Jinro, Ltd. would be dividing its imports and sales

---

[2]To support this allegation, in his affidavit in opposition to Defendants'
motion for summary judgment, plaintiff states only, "[t]hroughout this period. It
was my understanding that I would remain the exclusive Jinro distributor in my
territory, so long as I performed adequately.  I never really paid much attention
to the written agreements because there was a mutual understanding that I would
remain the distributor.  I understand that if my performance was inadequate, or if
I took on a competing brand, or if I did not dedicate myself to the Jinro
Products, I could be terminated."  Testimony of Plaintiff to the operation of
Defendant's mind would, of course, be inadmissible.  Fed.R.Evid. 701 ("If the
witness is not testifying as an expert, the witness' testimony in the form of
opinions or inferences is limited to those opinions or inferences which
are...rationally based on the perception of the witness").  No other evidence is
offered to establish this "mutual understanding."

between the Eastern and Western United States, with defendant JSA importing and selling the products to 26 states in the East (including Plaintiff's sales territory) and JAM continuing to import and sell the products on the West Coast. JSA, run by Defendant Lee, would become Plaintiff's importer, in place of JAM.

On November 15, 2001, Plaintiff was asked by JSA to enter into a distributorship agreement expiring on December 31, 2002 "valid and effective upon JSA obtaining the necessary permits and licenses from the applicable authorities to import and sell the Products hereunder." (the "2001 agreement"). Plaintiff contends that defendant Lee insisted that Plaintiff sign the agreement, threatening that if he did not, Plaintiff would no longer enjoy an exclusive distributorship in the Territory. The proposed new agreement included a higher price for the product for Plaintiff than for other United States distributors. Lee further refused to grant a long-term agreement as requested by Plaintiff. The parties dispute whether the 2001 agreement was ever signed.[3] Both parties agree, however, that they continued to negotiate the

---

[3]Plaintiff testified that he did sign the 2001 agreement (Tang Tr. at 17:17-18:4) and also that he did not sign the agreement (Tang Tr. at 23:22-24:3, 76:2-76:25). His affidavit in opposition to the motion for summary judgment only states that he felt pressured to sign the agreement, not that he signed it. Plaintiff has submitted only a copy of a translation of the agreement. The translation is not signed, nor does it contain a notation indicating that the original was signed. Plaintiff has not provided a copy of the original document. Defendants assert that the agreement was never executed.

terms of a new agreement through June 2002 without success.[4]

On April 10, 2002, Plaintiff was contacted by a representative of the New Jersey Division of Alcoholic Beverage Control (the "ABC") regarding JSA's application for a distributorship license in the State of New Jersey (part of Plaintiff's territory). Plaintiff sent a letter to the ABC alleging discriminatory pricing on the part of Defendants and an attempt to usurp Plaintiff's exclusive distribution rights for themselves.

Following Plaintiff's submission of the letter to the ABC, JSA's attorneys sent Plaintiff a letter offering to allow Plaintiff to continue to distribute Jinro Soju conditioned only upon Plaintiff's withdrawal of his objection to JSA's license application by May 28, 2002. Plaintiff eventually withdrew his objection, however, not before May 28, 2002.

On June 3, 2002, Plaintiff received a letter from Defendants stating that the distributorship agreement was "terminated as of November 30, 1999 and our products shall be supplied to you until June 30, 2002. From the order for July of this year, we will not take your order any longer."

After his termination, Plaintiff Tang began distributing a

---

[4]In Plaintiff's deposition testimony, he stated that the parties had never come to an agreement about the terms of the contract. When asked if Plaintiff and Defendant Lee ever came to an agreement about the price of the Jinro Soju, Plaintiff responded, "No. We didn't agree, but he raised the price and he continued to charge that price to me." *See* Tang Dep. Tr. at 26:17-22.

competing soju liquor in place of Jinro Soju, but asserts that he has not approached the volume and profit levels he had reached with Jinro Soju.

Presently before the Court is Defendants' motion for summary judgment dismissing Plaintiff's claims pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is granted.

**DISCUSSION**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Plaintiff and Defendants are each citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." FED. R. CIV. PRO. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a metaphysical doubt as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assoc. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc., v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all

inferences in favor of the non-moving party, there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

<u>Breach of Contract Claims</u>

Under New York law[5] "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages" resulting from the breach. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998) (*quoting Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994).) Plaintiff's claim fails with respect to the first element.

It is not disputed that Plaintiff's 1992 and 1997 written agreements with JAM expired in 1997 and 1999, respectively. If a valid *written* contract existed, therefore, at the time Defendants allegedly breached the contract in July 2002, it must have been the 2001 agreement with JSA.

Although Plaintiff has produced a translation of the 2001 agreement, neither party has produced the original contract in Korean. The translation is not signed, nor does it indicate that

---

[5] The parties' briefs cite cases applying New York law, and "such 'implied consent...is sufficient to establish choice of law.' " *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir.2004) (*quoting Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir.2000)). In any event, where, as here, the parties are silent about the choice of law question, the Court may apply the law of the forum. *See Michele Pommier Models v. Men Women N.Y. Model Mgmt.*, 14 F.Supp.2d 331, 336 (S.D.N.Y.1998) (*citing Keles v. Yale University*, 889 F.Supp. 729, 733 (S.D.N.Y.1995)).

there were signatures on the original document.  Defendants state
that the 2001 agreement was never executed, and Plaintiff is
inconsistent about whether or not he actually signed the
agreement.  In his deposition testimony, Plaintiff states both
that he signed the agreement, and that he did not sign the
agreement.  Such inconsistency is not sufficient to create a
"genuinely disputed" issue of fact if only because a statement
against ones interest trumps one which is self-serving.  In his
affidavit in opposition to the motion for summary judgment,
Plaintiff states that he "felt [he] had to sign the new
agreement," and that "Lee insisted [he] sign," but he never
alleges that he actually signed the agreement.  Even if these
statements are read to state that he did sign the agreement, it
is well-settled that Plaintiff may not, in order to defeat a
summary judgment motion, create a material issue of fact by
submitting an affidavit disputing his own prior sworn testimony
that he did not sign the agreement.  *See, e.g.*, *Mack v. United
States*, 814 F.2d 120, 124 (2d Cir.1987); *Miller v. International
Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir.) (same), *cert.
denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985);
*McLaughlin v. Cohen*, 686 F.Supp. 454, 456 (S.D.N.Y.1988) (same);
*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d
Cir.1969) (same); *Hayes v. New York City Department of
Corrections*, 84 F.3d 614, 619 (2d Cir.1996) ("factual issues

created solely by an affidavit crafted to oppose a summary

judgment motion are not 'genuine' issues for trial" (*quoting*

*Perma Research*, 410 F.2d at 578)).  Accordingly, I conclude that

plaintiff has not raised a genuinely disputed issue of fact as to

whether a valid written contract existed when Plaintiff's

distribution rights were terminated.[6]

Plaintiff claims that even if no written contract existed at

the time Defendants terminated Plaintiff, Defendants were in

breach of an implied agreement between Plaintiff and JAM.

Plaintiff Tang asserts that this Court should look to the

parties' course of performance after the written agreement with

JAM terminated to determine whether an implied contract existed

between plaintiff and JAM after the 1997 agreement expired in

1999.  Plaintiff relies on UCC 2-208(1), which states:

> Where the contract for sale involves repeated
> occasions for performance by either party with
> knowledge of the nature of the performance and
> opportunity for objection to it by the other, any
> course of performance accepted or acquiesced in
> without objection shall be relevant to determine the
> meaning of the agreement.

This UCC provision, however, provides only that *terms* of the

agreement should be interpreted according to the parties' course

of performance; it does not provide that the parties' course of

---

[6]Defendants argue that even if the parties did sign the agreement, the agreement never went into effect because the condition precedent, "JSA obtaining the necessary permits and licenses from the applicable authorities to import and sell the Products hereunder," was never fulfilled.  Plaintiff claims that he believes Defendants did obtain the necessary permits and licenses.  Because I conclude that the contract was not executed, I do not address this issue.

performance alone can establish that an implied contract exists after the expiration of the term of the written contract.

However, Courts can look to the course of parties' performance to determine whether parties have implicitly entered into a new agreement on the same terms after the expiration of a written contract. In *Martin v. Campanaro*, the Court of Appeals held that where an agreement expires by its terms, and the parties simply continue to perform on the same terms, "an implication arises that they have mutually assented to a new contract containing the same provisions as the old." *Martin v. Campanaro*, 156 F.2d 127, 129 (2d Cir.), *cert. denied*, 329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654 (1946). Here, however, Plaintiff testified that it was not his understanding that the old agreement continued on the same terms. Instead, plaintiff testified that the parties entered into a new agreement that he would be defendants' distributor indefinitely unless he gave cause for his termination, a term not contained in the old agreement. Moreover, the *Martin* Court found that where, as here, the parties had engaged in "subsequent unsuccessful negotiations" to enter into a new contract, a reasonable person would not believe that the parties intended to form new contract extending the terms of the old. *See id*. at 129-30. Here, after defendant explicitly informed Plaintiff that it regarded the 1997 agreement as terminated, the parties engaged in unsuccessful negotiations

to enter into a new contractual relationship.  Accordingly, it cannot be said that Plaintiff has raised a genuinely disputed issue of fact as to whether an implied contract existed between Plaintiff and any of the defendants at the time Plaintiff was terminated.

Nor could an oral contract have existed between Plaintiff and JSA at the time Plaintiff was terminated because it is undisputed that the parties never reached an agreement as to the price Plaintiff would pay for Defendant's Jinro Soju.  Plaintiff himself, in his deposition testimony,  stated with respect to the negotiations between himself and Defendant JSA, "We just argued, that's it."[7]  Because no written, implied, or oral contract existed at the time Plaintiff was terminated, Defendants did not breach any contractual obligation to Plaintiff.[8]

Plaintiff next claims that Defendants should be equitably estopped from terminating their contractual relationships with

_____

[7]Defendants argue that even assuming that an oral contract between Plaintiff and Defendant JSA existed, it is unenforceable under New York's Statute of Frauds, General Obligations Law § 5-701(a)(1), which requires a signed writing for proof of a contract which by its terms cannot be fully performed within a year.  *See, e.g. D & N Boening, Inc., v. Kirsch Beverages, Inc. et al.* (1984) 63 N.Y.2d 449, ; *United Beer Distr. Co., Inc. v. Hiram Walker, Inc., et al.* (1st Dep't 1990) 557 N.Y.S.2d 336, 338. *See also Skop* v. *Benjamin Moore, Inc.* (2d Cir. 1990) 909 F.2d 59, 60-61.  Because no oral contract between Plaintiff and Defendants existed after the expiration of the 1997 agreement, I do not address this issue.

[8]Plaintiff Tang argues that JAM did not provide him with reasonable notice prior to terminating him, stating, "[i]f a contract is silent as to amount of notice or if an agreement is terminable at will, the law implies a reasonable notice requirement.  According to Tang, such notice would require a minimum of 6 to 12 months to allow Tang to obtain and distribute a new product."  Because, as discussed above, Defendants owed no contractual obligations to Plaintiff, I conclude that Defendants were under no notice requirement at the time they terminated Plaintiff.

Plaintiff.  This argument also fails.

Under New York law, equitable estoppel requires proof of three elements: (1) conduct which amounts to a false representation of material facts; (2) an intent that such conduct will be acted upon by the other party; and (3) knowledge of the true facts.  *See Int'l Minerals and Resources, S.A. v. Pappas*, 96 F.3d 586, 594 (2d Cir.1996); *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir.1996); *Benincasa v. Garrubbo*, 141 A.D.2d 636, 638, 529 N.Y.S.2d 797, 800 (2d Dep't 1988).  "[T]he doctrine of equitable estoppel is to be invoked sparingly and only under exceptional circumstances." *Badgett v. N.Y.C. Health & Hosps. Corp.*, 227 A.D.2d 127, 128, 641 N.Y.S.2d 299, 300 (1st Dep't 1996).

Plaintiff has not alleged or shown that Defendants made any misrepresentation of material fact, nor that defendants intended that such conduct be acted upon by the Plaintiff.  At best, Plaintiff asserts only that "he understood, and JAM's conduct was consistent with the understanding, that he would remain the exclusive distributor in his territory so long as he adequately performed."  A statement that Defendants' actions misled plaintiff into thinking he could remain an exclusive distributor indefinitely as long as he behaved is not the same as saying that Defendants' acted as they did with the intention of misleading Plaintiff to his detriment.  As a result, I conclude that the

requirements for applying the principles of equitable estoppel to this case are not satisfied.

For the reasons stated above, Defendants' motion for summary judgment dismissing Plaintiff's breach of contract claims is granted.

<u>Tortious Interference with Contract Claim Against JSA and Lee</u>

A claim for tortious interference with a contract can be sustained only where plaintiff has demonstrated (1) the existence of a valid contract between itself and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of a breach of that contract by the third party; and (4) damages. *See Nordic Bank PLC v. Trend Group, Ltd.* (S.D.N.Y. 1985) 619 F.Supp. 542, 560-61.

Because, as discussed above, no contract existed between Plaintiff and JAM, Defendants JAS and Lee cannot be held responsible for interfering with a contractual relationship between Plaintiff and JAM. Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's claim for tortious interference with contract against Defendants JSA and Lee must be granted.

<u>Tortious Interference With Prospective Economic Advantage Claim</u>

"In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show: (1) business relations with a third party; (2) defendants'

interference with those business relations; (3) that defendants
acted with the sole purpose of harming the plaintiff or used
dishonest, unfair or improper means; and (4) injury to the
relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d
Cir.1994). "[A] claim for interference with advantageous
business relationships must specify some particular, existing
business relationship through which plaintiff would have done
business but for the allegedly tortious behavior." *Kramer v.
Pollock-Krasner Found.*, 890 F.Supp. 250, 258 (S.D.N.Y.1995)
(*citing PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818
F.2d 266, 269 (2d Cir.1987)); *see also Envirosource, Inc. v.
Horsehead Resource Dev. Co.*, No. 95 Civ. 5106, 1996 WL 363091, at
*14 (S.D.N.Y. July 1, 1996) ("A 'general allegation of
interference with customers without any sufficiently particular
allegation of interference with a specific contract or business
relationship' will not withstand a motion to dismiss.") (*quoting
McGill v. Parker*, 179 A.D.2d 98, 582 N.Y.S.2d 91, 95 (1st Dep't
1992)).

Plaintiff has made no particular allegations of interference
with specific contracts or business relationships.[9]  In fact,

---

[9]Plaintiff has submitted one affidavit from a customer, Hwa Jang, apparently
for the purpose of demonstrating that Plaintiff Tang's name is synonymous with
that of Jinro Soju.  Plaintiff does not reference Jang in any of his arguments,
and Jang's affidavit does not state that Jang would continue to purchase Jinro
Soju from Tang but for Defendant's interference.  Nor is any evidence produced
that Defendants acted as they did for the purpose of harming Plaintiff or that
they used dishonest or improper means.

when asked in an interrogatory to "[i]dentify and describe the
valid contracts or prospective contracts Plaintiff had with
numerous customers to purchase Jinro Soju, as alleged in...the
Complaint" Plaintiff responded only, that "[t]hese contracts
refer to the numerous oral agreements and prospective oral
agreements that Plaintiff had and would continue to have with its
customers for the purchase and sale of Jinro products, including
those customers with whom [Plaintiff] had developed long-term
relationships."  Nor has he been more particular or specific in
responding to Defendants' motion for summary judgment.
Accordingly, Defendants are entitled to summary judgment on
Plaintiff's claim for tortious interference with prospective
economic advantage.

<u>Unjust Enrichment Claims</u>

Plaintiff argues that as a result of his efforts, he
developed substantial good-will for the Jinro brand name in the
exclusive distribution territory.  He argues that Defendants, in
terminating Plaintiff's distribution rights, have acquired that
good will for their own benefit and been unjustly enriched at
Plaintiff's expense.

An unjust enrichment claim under New York law must contain
the following elements: (1) the defendant was enriched; (2)
enrichment was at the plaintiff's expense; and (3) the
defendant's retention of the benefit would be unjust.  *See Van*

*Brunt v. Rauschenberg*, 799 F.Supp. 1467, 1472 (S.D.N.Y.1992). The third element is satisfied when the circumstances are such "that equity and good conscience require defendant to make restitution." *Violette v. Armonk Associates, L.P.*, 872 F.Supp. 1279, 1282 (S.D.N.Y.1995).

Any compensation sought by Plaintiff under a quasi-contractual remedy must be for services performed *after* the Agreement was terminated because such a remedy is available only in the absence of a contractual remedy. Corbin on Contracts, § 1.20; Clark-Fitzpatrick, 70 N.Y.2d at 389, 521 N.Y.S.2d 653, 516 N.E.2d 190. In *Gidatex, S.r.L. v. Campaniello Imports, Ltd*, 49 F.Supp.2d 298, Campaniello served as the exclusive distributor of the Saporiti Italia brand of Italian furniture for Gidatex before Gidatex terminated the exclusive distributorship agreement and began locating new American distributorships in close proximity to Campaniello's showrooms. Campaniello brought a claim for unjust enrichment against Gidatex, arguing that as a result of Campaniello's efforts in protecting Gidatex's good-will, reputation, and market presence, Gidatex was being unjustly enriched at Campaniello's expense. *Id.* at 300-301. The Court, in granting summary judgment against Campaniello, reasoned that, even assuming that Campaniello's claim met the first requirement for a claim of unjust enrichment under New York Law, "it has not offered any proof that Gidatex's enrichment was at Campaniello's

expense." *Id.* at 301. Specifically, the Court reasoned that unjust enrichment is a quasi-contractual remedy, and as such, "[a]ny expenses incurred prior to the parties' termination of their contract should be covered by the terms of that Agreement" and "Campaniello has not offered any proof of expenditures in time or money for customer services, repair, or advertising after the termination of the Agreement." *Id.* at 304.

Similarly, in this case, Plaintiff has not offered any proof of expenditures *after* the termination of the agreement,[10] and the parties' 1997 written agreement stated, in relevant part:

> "JINRO shall not, by reason of the termination of expiration of this Agreement, be liable to DISTRIBUTOR (Tang) for compensation, reimbursement or damages either on account of present or prospective profits on sales or anticipated sales, or on account of expenditures, investments or commitments made in connection therewith or in connection with the establishment, development or maintenance of the business or goodwill of DISTRIBUTOR, or on account of any other cause or thing whatsoever....All expenditures, investments, and commitments that DISTRIBUTOR has made or may make in connection with this Agreement have been and will be made at DISTRIBUTOR's sole risk, and no such expenditures, investments, or commitments shall give rise to any right, interest, claim or cause of action."

Accordingly, I conclude that Plaintiff has failed to make out a claim for unjust enrichment. The *Gidatex* Court further reasoned,

---

[10]Although Plaintiff generally asserts that he made expenditures which resulted in an increase of sales of Jinro between 1986 and 2001, he makes no specific assertions of expenditures *after* his distribution rights were terminated.

"good business sense would indicate that Campaniello
continued to support the mark because it continued to
sell the furniture and because it wished to ensure that
its customers would continue to purchase furniture at
its stores. Any benefit to Gidatex was a by-product.
There is no rational economic motive to explain why
Campaniello would have acted **at its own expense** to
enrich Gidatex, a marketplace competitor and frequent
legal adversary. Even drawing all inferences in favor
of the non-movant, no rational trier of fact could find
that Campaniello enriched Gidatex's goodwill in the
Saporiti Italia mark at its own expense. *Id*. at 305
(emphasis added).

Similarly, in this case, Plaintiff Tang continued his

distribution and marketing efforts after the expiration of the

agreements for his own benefit, and no rational trier of fact

could find that Tang enriched Defendants' goodwill in the Jinro

Soju distribution market at his own expense.

Defendants motion for summary judgement against Plaintiff's

unjust enrichment claim is therefore granted.

<u>Unfair Competition Claim</u>

Under New York law, in order for a claim for unfair

competition to be sustained, the plaintiff must show that the

defendant misappropriated the plaintiff's labors or expenditures

and that the defendant displayed some element of bad faith in

doing so. *Davis & Co. Auto Parts, Inc. v. Allied Corp.* (S.D.N.Y.

1986) 651 F.Supp. 198, 203 (S.D.N.Y. 1986) *citing Saratoga Vichy

Spring Co. v. Lehman* (2d Cir. 1980) 625 F.2d 1037, 1044. Such

bad faith cannot be found where a defendant's alleged misconduct

represents nothing more than its having exercised its legal

rights. *See, e.g., Saratoga*, 625 F.2d at 1044 (no bad faith present in defendant's exploitation of a trademark which it was legally entitled to use); *Tri-Star Pictures, Inc. v. Leisure Time Productions, B.V.* 17 F.3d 38, 45 (2d Cir.), *cert. denied* (1994) 115 S.Ct. 484 (counterclaim alleging unfair competition was properly dismissed where there was no finding of contractual breach).

Because I have previously concluded that no valid contract existed between Plaintiff and Defendants which granted plaintiff exclusive distribution rights, this claim must fail. Therefore, Defendant's motion for summary judgment dismissing Plaintiff's unfair competition claim is granted.

<u>Breach of Covenant of Good Faith and Fair Dealing Claim</u>

Plaintiff finally argues that Defendants, in terminating Plaintiff's exclusive distribution rights, have breached a covenant of good faith and fair dealing. However, a court cannot impose a covenant of good faith and fair dealing where it would be inconsistent with the terms of the parties' express written agreement.

In *Adiel v. Coca-Cola Bottling Company of New York, Inc.*, 1995 WL 542432 (S.D.N.Y.1995), the Court stated:

"Plaintiffs have alleged that by terminating their distribution agreements, defendant breached an implied covenant of good faith and fair dealing. However, under New York law a party's reliance upon express contractual terms insulates it from such claims....[T]he implied covenant of good faith and fair

dealing does not provide a court *carte blanche* to
rewrite the parties' agreement.  Thus, a court cannot
imply a covenant inconsistent with terms expressly set
forth in the contract.  The agreements at issue here in
no respect required defendant to renew after May 31,
1995.  Accordingly, we dismiss plaintiffs' [claim]." *Id*
(internal citations omitted).

In the present case, the agreements between Plaintiff and
Defendants did not require defendant to renew the contracts after
their expiration.  Thus, Defendants could not have breached an
implied covenant of good faith and fair dealing by terminating
Plaintiff's distribution rights.

Accordingly, Defendants' motion for summary judgement
against this claim is granted.

## CONCLUSION

For the reasons set forth above, Defendants' motion for
summary judgment is granted.  The clerk is directed to enter
judgment in favor of Defendants and furnish a copy of this
opinion to all parties

SO ORDERED.

Dated :    Brooklyn, New York
           October 10, 2005

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge